# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 2057 | **DATE** | 3/17/2004 |
| **CASE TITLE** | Brian Zich vs. Glenbrook School Dist. 225, et al. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   Enter Memorandum Opinion and Order. Defendants' Motion for Summary Judgment (Docket No. 19-1) is granted. Defendants' Motion to Strike Plaintiff's Responses to Certain Paragraphs of Defendants' Local Rule 56.1 Statement of Facts and to Have Certain Facts Deemed Admitted (Docket Nos. 37-1, 37-2) is granted in part and denied in part as set forth in this opinion.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | |
|---|---|---|---|---|---|
| | No notices required. | | 2 | | **Document Number** |
| ✓ | Notices mailed by judge's staff. | | number of notices | | |
| | Notified counsel by telephone. | | 3-18-04 | | |
| | Docketing to mail notices. | | date docketed | | |
| ✓ | Mail AO 450 form. | | | | 38 |
| | Copy to judge/magistrate judge. | | docketing deputy initials | | |
| | | | 3/17/2004 | | |
| ETV | courtroom deputy's initials | | date mailed notice | | |
| | | Date/time received in central Clerk's Office | ETV | | |
| | | | mailing deputy initials | | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BRIAN ZICH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 02 C 2057 |
| | ) | |
| GLENBROOK SCHOOL DISTRICT 225,[1] | ) | Judge Rebecca R. Pallmeyer |
| PRINCIPAL MICHAEL RIGGLE, in his | ) | |
| individual capacity, ASSISTANT | ) | |
| PRINCIPAL WILLIAM BABINGTON, in | ) | |
| his individual capacity, HUMAN | ) | |
| RESOURCES DIRECTOR VICTORIA | ) | |
| VELANDER-HEISER, in her individual | ) | |
| capacity, PLANT OPERATOR JAMES | ) | |
| QUINN, in his individual capacity, | ) | |
| | ) | |
| Defendants. | ) | |

DOCKETED
MAR 1 8 2004

## MEMORANDUM OPINION AND ORDER

Plaintiff Brian Zich filed suit against Glenbrook School District 225[1] and several officials of Glenbrook North High School, alleging that they discriminated against him on the basis of his eye impairment in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq.; retaliated against him when he complained about the mistreatment; and deprived him of his right to equal protection of the law in violation of 42 U.S.C. § 1983. Defendants now seek summary judgment on all of Zich's claims. For the reasons explained here, the court finds no disputes of material fact concerning Zich's claims under the ADA. Defendants are entitled to judgment on those claims as a matter of law. Disputed facts preclude summary judgment on the merits of Zich's § 1983 claim, but the court concludes Defendants have qualified immunity on that claim. Accordingly, the motion is granted.

---

[1]     This Defendant's proper name is the Board of Education of Northfield Township High School District 225. (Answer.)

## BACKGROUND[2]

Zich was hired to work as a maintenance helper in the Glenbrook North High School ("Glenbrook North") Maintenance Department in 1982. (Zich Dep., at 14.) He held that position until 1992 when he became a maintenance person.[3] (*Id.* at 15.) Also in 1992, Zich was injured in a non-job-related accident when a car battery exploded in his face. As a result of that accident, Zich is legally blind in his left eye. The vision in his right eye is normal, and Zich has learned to compensate for the loss of peripheral vision on his left side by turning his head a certain way. (Def. 56.1 ¶¶ 99-101.)[4]

Despite being blind in his left eye, Zich is able to care for himself, drive, use a computer, interact with his children, read, and participate in a variety of recreational activities, including golf, rollerblading, and fishing. Since the accident, Zich has participated in softball and bowling leagues, and he obtained a black belt in Tai Kwon Do. In fact, he is currently pursuing a career in martial arts and has been a Tai Kwon Do instructor for more than two years. (Def. 56.1 ¶¶ 102-113, 115.) Except for short periods immediately after surgery, Zich was always able to perform all the functions of his job as a maintenance worker, including air conditioning, heating, plumbing, and

---

[2]     Defendants have moved to strike a number of the factual assertions in Plaintiff's Rule 56.1(b)(3)(A) Statement of Facts Controverting Defendant's 56.1(a)(3) Statement and Local Rule 56.1(b)(3)(B) Statement of Additional Facts, and seek to deem certain other facts admitted. Plaintiff also objects to certain of the factual assertions in Defendants' Local Rule 56.1 Statement of Material Facts. To the extent the court addresses any facts in this decision, the court overrules the parties' objections; to the extent the challenged facts are not addressed here, the objections are moot.

[3]     Zich testified that as a maintenance person, he had some supervisory authority over maintenance helpers. (Zich Dep., at 15-16.) There is some dispute in the record as to whether Glenbrook North continues to distinguish between maintenance "helpers" and "persons." For purposes of this motion for summary judgment, the court finds the distinction immaterial and will refer to the position generally as "maintenance worker."

[4]     Defendants' Local Rule 56.1 Statement of Material Facts is cited as "Def. 56.1 ¶ __."

2

electrical repairs which required him to use both heavy and light tools. (*Id.* ¶ 114; Zich Dep., at 30, 50-55; 159.)

## A.  Zich is Appointed Lead Man

James Quinn was hired as Glenbrook North's Plant Operator in September 1995. As Plant Operator, Quinn reports directly to Associate Principal William Babington and is responsible for supervising the maintenance, custodial, and grounds crews at Glenbrook North. (Def. 56.1 ¶¶ F, 1, 2.) Approximately six months after he was hired, Quinn decided to appoint a "lead man" to all of the maintenance and custodial shifts. (*Id.* ¶ 4.)  Quinn designated Zich as lead man for the maintenance crew based on his seniority and experience. (Quinn Dep., at 15; Pl. 56.1 ¶¶ 128, 129.)[5]  As lead man, Zich did not receive any extra pay, but he did have his own parking space, telephone line, and pager. (Def. 56.1 ¶ 35; Pl. 56.1 Resp. ¶ 35.)[6] The parties dispute whether the lead man had supervisory authority over other workers; Zich says he had such authority because he was responsible for allocating work assignments to the maintenance staff. (Pl. 56.1 Resp. ¶ 5.) Quinn testified that the position was "not so much a supervisory, but a reporting authority" and that lead men provided "some level of authority in the building" if Quinn was not available to make a decision. (Quinn Dep., at 15-16; Def. 56.1 ¶ 5.)  The parties agree that Zich was responsible for paperwork and phone calls which could absorb as much as half his workday. (Pl. 56.1 ¶ 132; Def. 56.1 Resp. ¶ 132.)[7]  He also helped coordinate the purchasing of maintenance items; served as a consulting resource for the other workers; and, in Quinn's absence, prioritized maintenance jobs and allocated assignments. (*Id.* ¶¶ 133-34, 140, 238; Def. 56.1 Resp. ¶¶ 133-34.)  Even when

---

[5]     Plaintiff's Local Rule 56.1(b)(3)(B) Statement of Additional Facts is cited as "Pl. 56.1 ¶ __."

[6]     Plaintiff's Rule 56.1(b)(3)(A) Statement of Facts Controverting Defendant's 56.1(a)(3) Statement is cited as "Pl. 56.1 Resp. ¶ __."

[7]     Defendants' Response to Plaintiff's Rule 56.1(b)(3)(B) Statement of Additional Facts is cited as "Def. 56.1 Resp. ¶ __."

Quinn and Assistant Plant Operator Lamar Nicholson were present, the maintenance workers were required to follow Zich's direction. (*Id.* ¶ 239.)

## B.    The Scheduling Change

In late summer 2001, Quinn approached Babington about eliminating the lead man position. (Def. 56.1 ¶ 8.) According to Quinn, the Maintenance Department needed additional manpower due to Glenbrook North's expanded night school program, and the school could obtain the best coverage by including all maintenance workers in a rotating schedule. (*Id.* ¶¶ 10, 12, 13.) Specifically, instead of having all maintenance employees working from 6:00 a.m. to 2:30 p.m., there would be three maintenance men working from 6:00 a.m. to 2:30 p.m. and two maintenance men working from 10:00 a.m. to 6:30 p.m. (*Id.* ¶¶ 11, 25, 27.) In Quinn's view, the lead position needed to be eliminated so that there would be enough men to cover the extended shifts. (Quinn Dep., at 92.) Babington agreed that the school needed maintenance workers available after the regular school day ended at 3:00 p.m. due to the facility's continued use during evening hours. He also agreed that the lead man position should be eliminated to implement the shift change in a fair manner. (Def. 56.1 ¶¶ 26, 28, 37, 38, 59, 60; Pl. 56.1 ¶ 222.) Quinn testified that he felt all maintenance workers should share equally in the new rotation "so it was not too rough on any individuals." (Quinn Dep., at 91.) He also stated that Zich's "abysmal attendance" and declining supervisory skills factored into his decision. (*Id.* at 69-70, 74-76; Def. 56.1 ¶¶ 15, 18.)

On September 14, 2001, Quinn and Babington held a meeting with the maintenance staff to announce the new rotating schedule and to discuss attendance in the department. (Def. 56.1 ¶¶ 11, 29.) Defendants claim that Babington discussed attendance to clarify the difference between vacation, sick leave, and emergency days; Zich says Quinn was angry because Zich and two other maintenance workers, Robert DeMaio and Allen Folkes, had all been out sick on the same day the previous week. (*Id.* ¶ 30; Pl. 56.1 Resp. ¶ 30.) Indeed, about a week before the

September 14 meeting, Quinn told maintenance worker Egrain Collazo that he was angry about the overlap in sick days and that Zich, DeMaio, and Folkes were taking too many days off. (Pl. 56.1 ¶¶ 252, 253.) Regardless, Zich admits that the attendance concerns were directed towards the entire maintenance staff; Babington addressed his concerns in a memo to all maintenance workers, which he distributed at the meeting. (Zich Dep., at 95-96; Def. 56.1 ¶ 31; DX I.)

In the same memo, Babington described the new rotating schedule. (DX I.) In discussing that schedule with the maintenance staff, Babington and Quinn also announced that the position of lead man was being eliminated. (Def. 56.1 ¶¶ 93, 116, 119.) The maintenance staff was generally opposed to the proposed rotating schedule and engaged in a heated exchange with Babington. Babington ultimately said that if people did not like the change, they could leave. (Id. ¶ 33; Pl. 56.1 ¶¶ 172, 173, 219.) At some point during the meeting, Zich stood and said, in effect, "I just want to put everyone on notice that I'm leaving." (Id. ¶¶ 94, 117.)

Zich disputes that Quinn needed to eliminate the lead man position, claiming that the new schedule "had no logistical bearing on the Maintenance Department's ability to retain the position of lead maintenance man." (Pl. 56.1 Resp. ¶ 10.) In support of this assertion, Zich cites deposition testimony from Allen Folkes, but Folkes stated only that he does not recall being told at the September 14 meeting that the lead man position was being eliminated because of a manpower shortage. (Folkes Dep., at 60-61.) Zich also suggests that manpower was not an issue because he always helped with his share of the maintenance work when he was the lead man. (Pl. 56.1 ¶ 249.)

### C.   Zich's Meetings with Glenbrook North Officials

Sometime after the September 24, 2001 meeting but before October 1, 2001, Zich met with Human Resources Director Victoria Helander-Heiser at her office in Glenview, Illinois. (Def. 56.1 ¶ 62.) Zich told Helander-Heiser that there was a "problem at North" that she needed to

investigate. (*Id.* ¶ 63; Pl. 56.1 ¶ 283.) According to Helander-Heiser, Zich said that he did not want to give her any details about the problem even though she repeatedly asked him to elaborate on his concerns. (*Id.* ¶ 64.) Zich testified that he told Helander-Heiser that he was being treated more harshly than his co-workers because of a physical disability and his need to take time off from work. He is "sure" that Quinn's and Babington's names "were brought up" in connection with that discussion. (Zich Dep., at 126-27.) A day or two after meeting with Zich, Helander-Heiser spoke briefly to Babington about the conversation. (Helander-Heiser Dep., at 56-58; Pl. 56.1 ¶ 284.) She does not recall whether Babington said he would look into the situation. She never spoke to Principal Michael Riggle or to Quinn about Zich's concerns. (Pl. 56.1 ¶ 284.)

On October 1, 2001, Zich's eye doctor, Kathleen M. Scarpullo, M.D., wrote a memo indicating that Zich was going to need eye surgery "in the near future." (PX M.) Quinn recalls seeing the memo, but does not remember exactly when. He does claim, however, that he knew nothing of Zich's further eye problems before Zich was removed as lead man on October 2, 2001. (Pl. 56.1 ¶¶ 176, 177; Def. 56.1 Resp. ¶ 176; Quinn Dep., at 103-04.) Zich submitted a doctor's note dated October 2, 2001 indicating that he needed to be excused from work from October 2 to 7, 2001 due to "secondary eye pain."[8] (PX N; Pl. 56.1 ¶ 178; Def. 56.1 Resp. ¶ 178.) Quinn does not recall seeing the note but concedes that Zich typically gave such notes to him and that he usually forwarded the originals to the Human Resources Department. (Quinn Dep., at 105-06.)

On October 2, 2001, Quinn sent Zich a memo confirming that the lead man position would no longer exist effective October 9, 2001. Quinn assigned Zich to the 10:00 a.m. to 6:30 p.m. shift rotation and to the "normal Saturday maintenance coverage," which would involve working on Saturday approximately once every five weeks. Quinn also notified Zich that his hourly pay would

---

[8]     It is not clear whether Zich actually took days off between October 2 and 7, 2001 pursuant to the October 2, 2001 doctor's note. Zich admits, however, that he received a memo from Quinn regarding his lead position on October 2, 2001. (Pl. 56.1 ¶ 175.)

not be affected for the 2001-2002 school year, but that his contract would be reviewed at the end of the academic year. (DX J; Def. 56.1 ¶¶ 46, 119; Pl. 56.1 ¶ 175.) Babington, who discussed the memo with Quinn before it went to Zich, wanted Zich to understand that if his performance was not acceptable, it would be reflected in his "contract pay"[9] the following year. (Pl. 56.1 ¶ 224.) Zich claims that Quinn posted the October 2 memo on the Maintenance Department bulletin board; Defendants dispute this claim. (*Id.* ¶ 291; Def. 56.1 Resp. ¶ 291.)

On October 9, 2001, Zich obtained another doctor's note stating that he needed to be off work from October 8 to 13, 2001 due to "his eye condition." The note further indicated that Zich had eye surgery scheduled for October 29, 2001. (PX O; Pl. 56.1 ¶ 178; Def. 56.1 Resp. ¶ 178.) A few days before his surgery, on October 24, 2001, Zich met with Babington and Helander-Heiser. Babington explained that he scheduled meetings with each of the maintenance workers on an individual basis because he was not pleased with the way the September 14, 2001 meeting had gone and wanted to give each worker an opportunity to discuss solutions to the new scheduling demands. (Babington Dep., at 77; Def. 56.1 ¶¶ 41, 42.) Helander-Heiser attended those individual meetings at Babington's request. (Def. 56.1 ¶ 67.) During Zich's meeting, he admittedly said very little to Babington and Helander-Heiser: he never said that Quinn was treating him unfairly; he did not complain about any problems at Glenbrook North; he offered no suggestions regarding the schedule change; and he never reported that anyone had been treating him in a discriminatory, harassing, or spiteful manner. (*Id.* ¶¶ 43, 69-71.)

The following day on October 25, 2001, Zich met with Dr. Riggle pursuant to an appointment Zich had made a few days earlier. Zich told Dr. Riggle that he was not being treated well by his supervisor and that he was unhappy about the changes to his lead man position. Dr. Riggle says that Zich declined to provide any details, but Zich testified that he told Dr. Riggle that

---

⁹        The parties do not explain what is meant by "contract pay."

7

he was being mistreated "because of having to take time off, because of being handicapped." (Riggle Dep., at 34-35, 72-73; Zich Dep., at 128-29; Pl. 56.1 ¶ 230.) Zich also claims that he told Dr. Riggle that he was being blamed for the fact that he and two other employees had all been off work the same day a few weeks earlier, and that he felt threatened by Babington, Quinn, and Helander-Heiser because they were taking away his lead position. (Zich Dep., at 105-07, 130.) At his deposition, Zich could not recall other specifics about his conversation with Dr. Riggle, but stated that he "pretty much sat down and started to break down and cry and told him what was going on in the maintenance department, what was happening to me and what I felt was wrong." (Id. at 129.)

During his conversation with Dr. Riggle, Zich indicated that other maintenance workers were similarly displeased with the scheduling changes but he did not give any names. Zich also said that Quinn had given some training opportunities to Allen Folkes instead of to Zich, but he did not provide any details about those opportunities. Dr. Riggle testified that he asked Zich "several times" if there "were something of substance that [Riggle] could deal with and should be taking a look at and [Riggle] could record it," but Zich did not elaborate on his complaints. (Riggle Dep., at 36.) Dr. Riggle encouraged Zich to speak to Babington about his concerns, but Zich said that he did not feel it would do any good. (Id. at 34-38, 72-73; Def. 56.1 ¶ 53.) At one point the conversation turned to Zich's eye condition and an impending surgery, and Zich told Dr. Riggle that he did not feel his supervisors showed much compassion. (Id. at 36-37; Pl. 56.1 ¶ 231.) At the end of the meeting, Dr. Riggle told Zich that he could come back and talk again, and that Dr. Riggle would be available to review any additional details or written statement that Zich wanted to submit. (Id. at 36-37.)

Zich never had another meeting with Dr. Riggle and never provided further details about his complaints. (Def. 56.1 ¶ 58.) Dr. Riggle himself did follow up by telling Babington that Zich was unhappy about his position and lack of training, and about the way Quinn was treating him. (Riggle

8

Dep., at 40-41; Pl. 56.1 ¶ 233; Def. 56.1 Resp. ¶ 233.) Babington had no specific response, other than to describe the September 14, 2001 meeting and to explain that the new schedule was necessary to cover evening hours due to increased use of the school's facilities. (*Id.* at 41-44; Pl. 56.1 ¶ 234.) Dr. Riggle mentioned Zich's upcoming eye surgery and told Babington to work with Helander-Heiser "to make sure that we were doing for the employee [Zich] what we should be doing." (*Id.* at 54-55.)

Dr. Riggle also spoke with Quinn about Zich's complaints. (Pl. 56.1 ¶ 150.) Dr. Riggle told Quinn that Zich was very upset about the way things were going at the school and about what he perceived to be unfair actions towards him. (*Id.* ¶ 151; Quinn Dep., at 58.) According to Quinn, Dr. Riggle said that Zich was concerned that "the morale of the Department was low – was being affected, and some things were being unfair, but there was no specifics brought out." (Quinn Dep., at 133-34.) Quinn did not agree that Zich was being treated improperly, and claims that Dr. Riggle never told him that Zich had specific complaints about Quinn. (*Id.* at 58-60; Pl. 56.1 ¶¶ 152, 153.) Dr. Riggle did not advise Helander-Heiser of the concerns Zich had raised on October 25, 2001. He did, however, tell her about Zich's imminent eye surgery so that she could monitor Zich's attendance and arrange to hire a temporary worker if necessary. (Pl. 56.1 ¶ 237.)

## D.    Zich's Interactions with the Maintenance Staff

As noted, Quinn claims that his loss of confidence in Zich's supervisory skills factored into the decision to remove Zich from the lead position.[10] In response, Zich points to his April 2000 and April 2001 performance reviews, which indicated that he was meeting expectations in his ability to work with others. Only Zich's April 1999 review indicated that he needed to improve in that area and "watch his temper with co-workers." (Def. 56.1 ¶¶ 15-17; PX J, K, L; Pl. 56.1 ¶¶ 162, 163.)

---

[10]    The court notes that this assertion undermines Defendants' claim that as a lead man, Zich did not have supervisory authority over other maintenance workers. (Def. 56.1 ¶ 5; Quinn Dep., at 15-16.)

Zich's co-workers paint a slightly different picture. Like Quinn, who stated that Zich was argumentative, loud, moody, and confrontational, Zich's co-workers consistently described Zich as moody and stated that he was difficult to work with. (Quinn Dep., at 84-85, 135-38; Folkes Dep., at 26-35, 74-77, 85-87; Klopp Dep., at 18-20; DeMaio Dep., at 11-12; Collazo Dep., at 9-10, 14-15, 23-28.) Allen Folkes testified that Zich was "intimidating" and a "bad boss" (Folkes Dep., at 34-35), and Robert DeMaio testified that he felt Zich treated him in an unprofessional manner and did not "act[] like a lead person should act." (DeMaio Dep., at 30-39.) Egrain Collazo stated that Zich was often in a bad mood and always took it out on Collazo, yelling at him about once a week. (Collazo Dep., at 14, 27.)

On the other hand, Mark Klopp thought Zich was a good supervisor, and DeMaio testified to developing a camaraderie with Zich after Zich learned that DeMaio had studied karate. (Pl. 56.1 ¶¶ 255, 256; Def. 56.1 Resp. ¶ 256.) In addition, Folkes described Zich as a "nice guy" as long as he "wasn't your boss," and Collazo said he liked Zich even though Zich picked on him. (Folkes Dep., at 26, 34; Collazo Dep., at 15.)

### E.    Zich's Attendance Problems

Another factor in the decision to remove Zich from the lead man position, Quinn says, was Zich's "abysmal" attendance. Quinn testified that "as we all know, [Zich] had an eye problem, and there were times that that was his problem, and certainly, we are sympathetic to that. Over and above that, though, he was a – he would consistently use his sick days that were allotted to him on a yearly basis." (Quinn Dep., at 62, 69-70; Def. 56.1 ¶ 18; Pl. 56.1 ¶ 157.) Quinn stated that Zich had a pattern of missing work at the beginning and end of work weeks, and his varying excuses "would bring some question into your mind about possible problems." (Id. at 63-64.) During his last year or two of employment at Glenbrook North, Zich used "quite a bit" of his accrued sick leave to attend to his eye condition, and took additional sick days pursuant to the school's "sick

bank" program when he had eye surgery. According to Quinn, however, Zich also used sick days when his children were home sick or his dog was ill. Quinn admittedly did not object to Zich's using his sick days in that manner: "it's not something I, I debate." (Id. at 62-66, 68-69.)

In Zich's April 2000 performance review, Quinn indicated that Zich had missed "37 days of work due to various problems" and stated that Zich would not be able to continue as lead man unless his attendance improved "dramatically." (PX K.) Zich's April 2001 performance review noted some improvement in his attendance but indicated that further improvement was needed. (PX L.) According to Quinn, Zich was setting "a terrible example, as the lead man, for the rest of the crew, and . . . if you're going to be the leader, you have to lead in all categories." (Quinn Dep., at 70.) Zich himself estimates that between September 2000 and March 2002, he had four or five eye surgeries and took approximately 100 sick days.[11] (Pl. 56.1 ¶¶ 259, 260.) He also testified generally that he felt the criticism of his attendance was discriminatory because most of his absences were due to his eye condition. (Zich Dep., at 68-69, 120-21, 184-85.)

Quinn spoke to Babington about Zich's attendance two or three times between the summer of 2001 and the date Zich resigned on March 8, 2002. Quinn was concerned that he had seen a "remarkable drop in attendance" among all of the maintenance workers, and he attributed it to the fact that Zich, their lead man, was often absent.[12] (Pl. 56.1 ¶ 159; Quinn Dep., at 70-71; Def. 56.1 Resp. ¶ 159.) Quinn also informed Babington that Zich's absences were affecting Zich's job performance. During part of that time period – from mid-summer 2001 to September 14, 2001 – Zich's absences were not, according to Quinn, generally related to his eye. (Id. ¶ 179; Def 56.1

---

[11]     Neither party has submitted any attendance records to substantiate the number of days Zich was off work or the specific reasons given for those absences.

[12]     The parties do not indicate when the conversations between Quinn and Babington occurred, but Quinn's concerns about Zich setting a bad example for the other maintenance workers must have been raised prior to October 9, 2001 when Zich was officially removed as lead man.

Resp. ¶ 179; Quinn Dep., at 115-16.) Quinn did not, however, provide an alternative explanation for Zich's absences, other than Zich's need to care for his sick children and ill dog at times during the last year or two of his employment. (Def. 56.1 Resp. ¶ 156.) Babington's most recent conversation with Quinn regarding Zich's attendance related to Babington's concern that Zich provide the proper documentation so that he could access the "sick bank" for his October 29, 2001 eye surgery. (Babington Dep., at 44-45.)

## F.    Zich's Job Duties After His Removal As Lead Man

After Zich was removed as lead man, he no longer prioritized or assigned jobs to the maintenance workers. (Pl. 56.1 ¶ 141.) Nor was he responsible for consulting with other maintenance workers about jobs, though the workers were free to seek his advice if they so chose. (Id. ¶ 146; Def. 56.1 Resp. ¶ 146.) Zich was allowed to keep his assigned parking space and his designated telephone line, benefits no other maintenance worker has to this day. He also maintained the same salary and benefits, except that he was required to turn in his pager. (Quinn Dep., at 125-26; Pl. 56.1 ¶ 188; Def. 56.1 ¶ 120.) Though Quinn told Zich in the October 2, 2001 memo that Zich's pager would be issued to a "designated daily 'man on call,'" Quinn never in fact distributed the pager in such a manner. (Pl. 56.1 ¶¶ 189, 191.)

Zich claims that after October 1, 2001, he was assigned jobs that were beneath his skill and seniority level, such as changing ceiling tiles, plunging toilets, and performing "[a]ny dirty job that would come up." (Def. 56.1 ¶ 122; Zich Dep., at 108-10; Pl. 56.1 ¶ 289.) Zich admits, however, that he does not know whether other maintenance workers were similarly asked to perform such jobs and, indeed, suspects that they were. Zich testified, for example, that he was "sure" that maintenance worker Bill Denexus, who had more seniority than Zich, also had to unstop toilets and change ceiling tiles. (Zich Dep., at 108-11.) In addition, Folkes testified that he, too, had to install or replace ceiling tiles and plunge or "rod out" toilets, which he considered part of his job as a

maintenance worker. (Def. 56.1 ¶ 96.) From the other workers' perspectives, Zich was doing the same jobs as everyone else. (Collazo Dep., at 47; DeMaio Dep., at 46.)

Zich disputes that Defendants actually eliminated the lead man position, claiming that Folkes has assumed the majority of the lead responsibilities. (Pl. 56.1 Resp. ¶¶ 6, 7, 15, 119.) Quinn testified that when he is not present, he always tries to designate someone as the "answer to" person to represent the Maintenance Department and respond to radio calls and emergencies. (Quinn Dep., at 32-33.) Quinn considers Folkes his "priority one" maintenance man for prioritizing and assigning jobs in Quinn's absence, but DeMaio, Klopp, and the department secretary have also helped in that regard. (*Id.* at 30-32; Pl. 56.1 ¶ 186.) Quinn admittedly never designated Zich as the "answer to" person, explaining that he felt it would be unethical or improper because "[i]f you've had the job once and it was taken away, and then to give it to you on a spot basis doesn't make any sense." (*Id.* at 33; Pl. 56.1 ¶ 145.) Though Quinn views Folkes as his "priority one" man, none of the maintenance workers believes that Folkes or anyone else holds the lead position anymore. (Folkes Dep., at 13; Klopp Dep., at 25-26; DeMaio Dep., at 23-24; Collazo Dep., at 32.)

As further evidence that Folkes in fact took over as lead man, Zich notes that Quinn selected Folkes to join Quinn in attending five vendor-provided computer training classes to learn a new Siemens computer system installed to run the HVAC (heating, electrical, and air conditioning) functions at Glenbrook North. (Pl. 56.1 ¶ 181; Folkes Dep., at 17-18; Quinn Dep., at 118-19.) Quinn says he selected Folkes for the training because he thought Folkes had a greater aptitude for computers than the other maintenance workers. (*Id.* ¶ 183.) Zich notes that in his April 1996 performance evaluation, Quinn recognized Zich's "aptitude to excel" in the area of computer skills. (*Id.* ¶ 184; PX Q.) Nevertheless, Zich was only allowed to attend one computer training class. He was not alone in that regard; Mark Klopp similarly attended only the one class attended by Zich. (Pl. 56.1 Resp. ¶ 96; Pl. 56.1 ¶¶ 180, 182; Folkes Dep., at 18-19, 21-23.) When Zich and

Klopp once asked to attend more training classes, Quinn said that they were too busy in the department at that time. (Zich Dep., at 112-13.)

Zich claims that as lead man, he was the only maintenance worker to carry a pager. He also suggests that after he was removed as lead man, Quinn gave his pager to Folkes. (Pl. 56.1 ¶¶ 187, 190; Pl. 56.1 Resp. ¶ 92.) In fact, Folkes, Quinn, and Assistant Plant Operator Lamar Nicholson all carried pagers before Zich was removed as lead man. According to Quinn, Folkes currently has a pager that is programmed to the Siemens automated computer system because he is the most knowledgeable about that system. Folkes spends approximately 25 percent of his workday at the Maintenance Department computer terminal and responds to approximately 50 percent (or about 150) of the alarm calls each week. (Id. ¶¶ 192, 196, 197; Pl. 56.1 Resp. ¶ 96; Def. 56.1 Resp. ¶¶ 187, 197; Quinn Dep., at 120-24; Pl. 56.1 ¶ 239.) Folkes also accompanies other maintenance workers in responding to alarm calls in order to assist and train them in using the computer to rectify problems in the building. (Pl. 56.1 ¶ 199.)

### G.    Zich's Resignation and Lawsuit

Zich admits that between the September 14, 2001 meeting and October 1, 2001, he "might have" decided to leave his employment at Glenbrook North. It was around that time, however, that he learned his cornea was deteriorating and he needed further eye surgery. (Def. 56.1 ¶ 118; Zich Dep., at 94.) Zich underwent the surgery in late October and took off 35 days of work to recuperate through November 2001. (Zich Dep., at 103; Pl. 56.1 ¶ 260.) It is not clear when exactly Zich returned to work after his surgery, but sometime prior to December 2, 2001, he asked the school Athletic Director and a few other teachers to write letters of recommendation on his behalf.

Zich claims that after he complained to Babington, Dr. Riggle, and Helander-Heiser that he was being mistreated at work, Quinn became "abusive." He contends generally that he was "[v]erbally being abused; do this, do that, this is what I want, watch what I do," but he described

14

only one incident in support of this claim. (Zich Dep., at 150, 155.) Specifically, on January 28, 2002, a co-worker radioed to Zich that there was a broken basket in the field house. Zich responded that the co-worker should call Folkes if he needed help. According to Zich, "Quinn pulled me aside and verbally told me what I should start saying and I'd better act correctly and do this and do that." (Id. at 153; PX R.) Quinn put a disciplinary memo in Zich's personnel file noting that when he questioned Zich about the incident, Zich said that "all maintenance men know that Allen Folkes is running the maintenance department and that everybody is tired of the situation." (PX R; Pl. 56.1 ¶ 276.) In Quinn's view, Zich had spoken in a sarcastic tone and his behavior was disruptive and insubordinate, but he did not include this in his disciplinary memo and does not recall conveying that objection to Zich. (Quinn Dep., at 132-33; Pl. 56.1 ¶ 278.) Zich refused to sign the written reprimand. (Def. 56.1 Resp. ¶ 277.)

A few days later on February 4, 2002, Zich filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging disability discrimination under the ADA. (Cmplt. ¶ 6.)[13] Approximately one month later on March 8, 2002, Zich resigned his position with Glenbrook North. (Pl. 56.1 ¶ 160.) In his resignation letter to Helander-Heiser, Zich stated that Quinn had subjected him to harassing, abusive, and discriminatory treatment, and that nothing had been done to improve the situation despite Zich's repeated complaints to Helander-Heiser, Babington, and Dr. Riggle. Zich stated that his working conditions were so intolerable that he had no choice but to resign. (PX S; Def. 56.1 ¶ 66.) Following his resignation, Zich filed a second EEOC charge dated March 20, 2002, again asserting claims under the ADA.[14] (Cmplt. ¶ 6.) Also on March 20, 2002, Zich filed this federal lawsuit against Glenbrook School District 225 (the "District") alleging that he was subjected to discrimination and retaliation because of his eye

[13]     Zich's First Amended Complaint is cited as "Cmplt. ¶ __."

[14]     The parties have not submitted copies of the EEOC charges nor explained the specific theories of relief.

15

impairment. Approximately one week later on March 26, 2002, Zich began working as a certified maintenance technician at Woodland School District 50 in Gurnee, Illinois. In that position, he performs essentially the same duties that he had performed at Glenbrook North. (Def. 56.1 ¶ 126; Zich Dep., at 147, 153.)

At the time Zich resigned, Glenbrook North employed five maintenance workers. As of December 13, 2002, there were four maintenance workers and two maintenance trainees. Quinn's optimal manpower goal is to have five maintenance staff members. (Quinn Dep., at 89; Pl. 56.1 ¶¶ 166-68; Def. 56.1 Resp. ¶¶ 166-68.) In June 2002, Quinn changed the rotating schedule so that one person – the "morning maintenance man" – would permanently cover the 10:00 a.m. to 6:30 p.m. shift each day rather than having each maintenance worker cover that shift in monthly blocks on a rotating basis. Egrain Collazo applied for, and was awarded the morning maintenance man position. All other maintenance employees work the regular 6:30 a.m. to 2:30 p.m. shift. (Pl. 56.1 ¶¶ 170, 244, 245; Def. 56.1 Resp. ¶ 170.)

On May 7, 2002, Zich filed a First Amended Complaint ("FAC"), adding Dr. Riggle, Babington, Helander-Heiser and Quinn as defendants in their individual capacities, and alleging discrimination and constructive discharge in violation of the ADA (Count I); unlawful retaliation (Count II); and a denial of equal protection of the law under 42 U.S.C. § 1983 (Count III). Defendants have moved for summary judgment on all three counts.

## DISCUSSION

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether there is a genuine issue of fact, the court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001). The court's function in ruling on a motion for summary judgment is not to weigh the evidence, but rather to determine if there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Where factual matters are in dispute, the court is required to credit the nonmovant's version of events. *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 802 (7th Cir. 2000). The nonmoving party must do more, however, than demonstrate a factual dispute; she must offer evidence sufficient to support a verdict in her favor. *Basith v. Cook County*, 241 F.3d 919, 926 (7th Cir. 2001). Employment discrimination cases are inherently fact-intensive, but the court is not required to "scour the record" in an effort to assist the plaintiff in avoiding summary judgment. *Greer v. Bd. of Ed. of City of Chicago*, 267 F.3d 723, 727 (7th Cir. 2001).

Zich claims that the District discriminated against him on the basis of an actual or perceived disability (blindness and related problems with his left eye) in violation of the ADA by removing him as lead maintenance man, subjecting him to hostile and abusive treatment, ignoring his complaints of discrimination, and retaliating against him because he made use of his authorized sick time benefits to care for his eye. Zich claims that as a result of this treatment, he was forced to resign his position on March 8, 2002. Zich also alleges that for similar reasons, the District and each individual Defendant deprived him of his right to equal protection of the law in violation of 42 U.S.C. § 1983.

## A.    Disability Discrimination

To establish a claim under the ADA, Zich must first prove that he is disabled within the meaning of the Act and that he is qualified to perform the essential functions of the job either with or without reasonable accommodation. *Dyke v. O'Neal Steel, Inc.*, 327 F.3d 628, 631 (7th Cir. 2003); *Moore v. J.B. Hunt Transport, Inc.*, 221 F.3d 944, 950 (7th Cir. 2000). Disability is defined as "(A) a physical or mental impairment that substantially limits one or more of the major life

activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2); *Dyke*, 327 F.3d at 632. If Zich makes this threshold showing, he must then establish a violation of the Act either by presenting evidence of disparate treatment or by showing a failure to accommodate. *Sieberns v. Wal-Mart Stores, Inc.*, 125 F.3d 1019, 1021-22 (7th Cir. 1997). In this case, Zich is pursuing only a disparate treatment claim.

Zich does not attempt to proceed under the "direct method," either by presenting direct evidence or circumstantial evidence that establishes a "convincing mosaic." *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1061 (7th Cir. 2003); *Volovsek v. Wisconsin Dep't of Agriculture, Trade and Consumer Protection*, 344 F.3d 680, 689 (7th Cir. 2003). Accordingly, Zich must proceed under the familiar burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Zich must first establish a prima facie case of discrimination by showing that: (1) he is disabled within the meaning of the Act; (2) he was meeting his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees received more favorable treatment. *Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 572 (7th Cir. 2001). If the District articulates a legitimate, non-discriminatory explanation for its actions, then Zich must prove that the explanation is a pretext for intentional discrimination. At all times, the ultimate burden of persuasion remains with Zich. *Nawrot v. CPC Int'l*, 277 F.3d 896, 905-906 (7th Cir. 2002).

The District argues that Zich cannot establish a prima facie case of disability discrimination because he does not have an actual or perceived disability within the meaning of the Act. The court agrees.

### 1. Actual Disability

To establish discrimination on the basis of an actual disability, Zich must first show that he has an impairment that substantially limits one or more of his major life activities. 42 U.S.C. § 12102(2); *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 195 (2002). There is no

dispute that Zich has an impairment (blindness in his left eye) within the meaning of the ADA. *See* *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 563 (1999) (individual with monocular vision had an impairment under the ADA). *See also* 29 C.F.R. § 1630.2(h)(1)) (defining "physical impairment" as "any physiological disorder, or condition . . . affecting one or more of the following body systems: . . . special sense organs"). The only question is whether that impairment substantially limits any major life activities.

Zich claims that his eye condition substantially limits the major life activity of working because it forces him to "avail himself of the sick time he has accrued" at Glenbrook North. (Pl. Resp., at 11.)[15] An individual is substantially limited in the major life activity of working only if he is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." *Stein v. Ashcroft*, 284 F.3d 721, 724 (7th Cir. 2002) (quoting *Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 506 (7th Cir. 1998)). "The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 491 (1999).

Nothing in the record supports Zich's contention that he is substantially limited in his ability to work. To the contrary, he is admittedly able to read, drive, use a computer, and perform all the functions of his job as a maintenance worker, including making repairs to the school's air conditioning, heating, plumbing, and electrical systems using both heavy and light tools. (Def. 56.1 ¶¶ 103, 110, 114.) In fact, within one or two weeks of resigning his job at Glenbrook North, Zich began working as a certified maintenance technician at Woodland School District 50, performing essentially the same duties that he had performed at Glenbrook North. (*Id.* ¶ 126; Zich Dep., at 147, 153.) *See Moore*, 221 F.3d at 953 (employee was not substantially limited in the ability to

---

[15]     Plaintiff's Memorandum of Law in Response to Defendants' Motion for Summary Judgment is cited as "Pl. Resp., at __."

work as a bus driver where he was "currently employed as a charter bus driver"); *Felten v. Eyemart Express, Inc.,* 241 F. Supp. 2d 935, 942 (E.D. Wis. 2003) (general manager of optical store was not barred from working in a class of jobs where he found another job managing an optical department after his discharge). The mere fact that Zich periodically needs to take time off to tend to his eye in no way demonstrates that he is unable to perform a broad class of jobs. On these facts, the court cannot say that Zich has an actual disability within the meaning of the ADA.

### 2.    Perceived Disability

Zich claims that even if he does not suffer from an actual disability, the District regarded him as being disabled. 42 U.S.C. § 12102(2)(C). The "regarded as" provisions of the ADA are designed to "provide a remedy for discrimination based on misperceptions about the abilities of impaired persons." *Krocka v. City of Chicago,* 203 F.3d 507, 513-14 (7th Cir. 2000). To establish a disability under § 12102(2)(C), Zich must show that District officials mistakenly believed that his nonlimiting impairment substantially limits one or more major life activities. *Murphy v. United Parcel Service, Inc.,* 527 U.S. 516, 521-22 (1999). "It is not enough for [Zich] to show that [the District] was aware of [his] impairment; instead [Zich] must show that [the District] knew of the impairment and believed that [he] was substantially limited because of it." *Moore,* 221 F.3d at 954 (quoting *Skorup v. Modern Door Corp.,* 153 F.3d 512, 515 (7th Cir. 1998)).

Zich argues that the District regarded him as disabled because it "treated Plaintiff as though he was failing to meet reasonable performance expectations because of the sick time he utilized to treat his eye condition when in fact Plaintiff was satisfying the reasonable performance expectations." (Pl. Resp., at 13.) This argument misses the mark. In *Moore v. J.B. Hunt Transport, Inc.,* the plaintiff claimed that he was fired from his position as a truck driving instructor because he suffered from rheumatoid arthritis. 221 F.3d at 948-49. The plaintiff alleged, in part, that the employer perceived his arthritis as substantially limiting because it terminated his

20

employment. The Seventh Circuit disagreed. The regarded-as section of the ADA requires "proof beyond the plaintiff's inability to satisfy the expectations of a single employer; to be 'substantial,' a limitation on the ability to work must be one that affects the plaintiff's ability to perform a class or range of jobs before it qualifies as a disabling limitation under the ADA." *Id.* at 954. The court found no evidence that the employer regarded the plaintiff as restricted from performing a broad range of jobs and, thus, he was not regarded as disabled under the Act. *Id.* at 954-55.

In this case, similarly, the District's alleged belief that Zich was not meeting reasonable performance expectations by taking excessive sick leave to care for his eye in no way demonstrates that the District perceived him as unable to perform a wide range of jobs. Other than removing Zich from the lead man position, which at most amounted to a loss of supervisory authority, there is no evidence that the District ever questioned his ability to perform his job as a maintenance man, much less any other job or class of jobs in the economy. *See Peters v. City of Mauston*, 311 F.3d 835, 843 (7th Cir. 2002) ("[i]t is clear . . . that an employer does not regard a person as disabled simply by finding that the person cannot perform a particular job"); *E.E.O.C. v. Rockwell Int'l Corp.*, 243 F.3d 1012, 1019 (7th Cir. 2001) (employer must perceive employee to be restricted in a broad range of jobs).

Zich's assertion that the District perceived him as disabled because it harassed and punished him for taking sick time and imposed "heightened performance standards" in contravention of its sick time policy is similarly misplaced. (Pl. Resp., at 13.) "[T]he ADA only provides protection from adverse employment actions for individuals with disabilities." *Krocka*, 203 F.3d at 514. Evidence that the District allegedly took an adverse action against Zich, who happens to suffer from an impairment, "is not evidence that [the District] regarded that impairment as substantially limiting, and, thus, it is insufficient to show that [the District] regarded [Zich] as disabled." *Id.* (citing *Harrington v. Rice Lake Weighing Sys., Inc.*, 122 F.3d 456, 461 (7th Cir. 1997)) ("[t]he notion that Rice Lake must have fired Harrington because it regarded him as disabled

21

and that it plainly regarded him as disabled because it fired him is attractive but circular – it lacks a causal antecedent"). Zich has failed to establish that the District perceived him as disabled and, thus, he cannot state a claim of disability discrimination under the ADA.

## B.    Retaliation

A plaintiff bringing a retaliation claim under the ADA may resist summary judgment by presenting evidence of discrimination under the "direct method" or the "indirect method," referred to as the *McDonnell-Douglas* burden-shifting approach. *Kersting v. Wal-Mart Stores, Inc.*, 250 F.3d 1109, 1117 (7th Cir. 2001). Zich does not attempt to proceed under the "direct method," either by presenting direct evidence or circumstantial evidence that establishes a "convincing mosaic." *Cerutti*, 349 F.3d at 1061; *Volovsek*, 344 F.3d at 689. Thus, he must first establish a prima facie case of retaliation by showing that "'(1) after lodging a complaint about discrimination, (2) only he, and not any otherwise similarly situated employee who did not complain, was (3) subjected to an adverse employment action even though (4) he was performing his job in a satisfactory manner.'" *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 897 (7th Cir. 2003) (quoting *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 642 (7th Cir. 2002)). The District claims that Zich cannot satisfy these elements.

### 1.    Protected Activity

The District first argues that Zich did not engage in any statutorily protected expression because he never complained to anyone about Babington's and Quinn's allegedly harassing and discriminatory conduct. (Def. Mem., at 10.)[16] The District insists that Zich never complained about discrimination or harassment in speaking to Dr. Riggle, Babington, or Helander-Heiser. Zich, however, testified that he specifically told Helander-Heiser that he was being treated more harshly

---

[16]    Defendants' Memorandum of Law in Support of Rule 56 Motion for Summary Judgment is cited as "Def. Mem., at __."

than his co-workers because of his physical disability, and that he told Dr. Riggle that he was being mistreated "because of having to take time off, because of being handicapped." (Zich Dep., at 126-29.) This is sufficient to raise a question of fact as to whether Zich complained about unlawful discrimination or harassment. *See Hefferman v. Board of Trustees of Illinois Community College Dist. 508*, 310 F.3d 522, 526 (7th Cir. 2002) ("it is the unique province of the jury to assess credibility questions").

### 2. Adverse Action After Complaints

The District next argues that Zich did not suffer any adverse employment action after he lodged his alleged complaints. Zich claims that after he complained about discrimination, Defendants stripped him of his lead position, subjected him to abusive and hostile treatment, disciplined him for no reason, and left him no choice but to resign.[17] (Pl. Resp., at 14.) Assuming that all of these constitute adverse actions, none supports a finding of retaliation in this case.

Zich finds it significant that he complained to Helander-Heiser about discrimination sometime between September 24 and October 1, 2001, and then received an official notification from Quinn on October 2, 2001 that his lead position was being taken away. Zich admits, however, that Quinn and Babington announced that the lead position was going to be eliminated at the September 14, 2001 meeting with the maintenance staff, at least ten days before Zich ever spoke to Helander-Heiser. (Def. 56.1 ¶ 116.) Zich insists that the decision was not finalized as of September 14, 2001, but there is no evidence that the District ever considered retaining Zich in the lead position after that date. Thus, there is no evidence that the decision to remove him as lead was made after he lodged his alleged complaints about Quinn. *See Johnson*, 325 F.3d at 897

---

[17]     Zich also alleges that Defendants "threatened Plaintiff's job and salary," (Pl. Resp., at 14), but the record does not support this assertion. Aside from being removed as lead man, there is no evidence that Zich's position as a maintenance worker was ever in jeopardy. Nor is there any evidence that Defendants threatened Zich's salary, other than to notify him that his contract would be reviewed at the end of the school year. (PX P.)

(prima facie case requires showing of adverse action "*after* lodging a complaint about discrimination") (emphasis added).

The only evidence of abusive treatment after Zich complained to school officials is Zich's general assertion that he was "[v]erbally being abused; do this, do that, this is what I want, watch what I do." (Zich Dep., at 150, 155.) "It is well-established that in order to withstand summary judgment, the non-movant must allege *specific* facts creating a genuine issue for trial and may not rely on vague, conclusory allegations." *Gabrielle M. v. Park Forest-Chicago Heights, Illinois Sch. Dist. 163*, 315 F.3d 817, 822 (7th Cir. 2003) (emphasis in original) (student's assertion that classmate "bothered" her by doing "nasty stuff" was too vague to support harassment claim). Here, Zich fails to present sufficient evidence that any harassment or abusive treatment occurred. Nor does he offer any evidence at all regarding any similarly situated employees who did not complain and were not harassed.

Zich does point to one incident on January 28, 2002 when Quinn reprimanded him for telling a co-worker needing assistance to contact Allen Folkes instead. Significantly, Zich does not deny that he made the statement to his co-worker. Nor has he identified any similarly situated employee who made a similar remark to his co-worker but was not reprimanded. *See, e.g., Volovsek*, 344 F.3d at 692 (retaliation claim failed where plaintiff presented no evidence that a similarly situated employee who did not file discrimination complaints was promoted). Zich also claims that after he was removed as lead man, he was assigned jobs that were beneath his skill and seniority levels, such as changing ceiling tiles, plunging toilets, and performing "[a]ny dirty job that would come up." (Def. 56.1 ¶ 122; Zich Dep., at 108-10.) Even assuming these constitute adverse actions – which the court highly doubts, *Stutler v. Illinois Dep't of Corrections*, 263 F.3d 698, 703 (7th Cir. 2001) ("the adverse action must materially alter the terms and conditions of employment") – it is undisputed that other maintenance workers were also assigned to perform those same tasks.

Thus, Zich has not raised any genuine issues of fact as to whether he received inferior assignments because he complained about harassment and discrimination.

Zich's final assertion – that he was constructively discharged – merits little discussion. An employee is constructively discharged when he resigns his position because of intolerable working conditions that a reasonable person would also have found unbearable. *Robinson v. Sappington*, 351 F.3d 317, 336 (7th Cir. 2003). "Working conditions for constructive discharge must be even more egregious than the high standard for hostile work environment because in the ordinary case, an employee is expected to remain employed while seeking redress." *Id.* (internal quotations omitted). Zich's vague claim of "[v]erbally being abused" does not remotely approach the level of harassment required for a constructive discharge. *See Driver v. Arbor Mgt., Inc.*, No. 00 C 3933, 2001 WL 1155089, at *5 (N.D. Ill. Sept. 26, 2001) ("vague allegations of hostile environment . . . fall far short of what is required to prove constructive discharge"). Zich may have been displeased that he lost his position as lead man, but that loss did not make his working conditions so unbearable as to leave him no choice but to quit. *See Simpson v. Borg-Warner Automotive, Inc.*, 196 F.3d 873, 877 (7th Cir. 1999) ("this Court has found a range of unpleasant and even embarrassing employer actions tolerable and therefore insufficient to effect a constructive discharge"); *Harriston v. Chicago Tribune Co.*, 992 F.2d 697, 705 (7th Cir. 1993) (an arbitrary reprimand, exclusion from office activities, assignment to a fallow sales territory and lack of supervisor support were tolerable).

In sum, Zich has not established that he suffered any adverse employment actions after he allegedly lodged complaints of discrimination and harassment, or that similarly situated employees who did not complain were treated more favorably. Defendants' motion for summary judgment on Zich's retaliation claim is therefore granted.

## C. Section 1983

In Count III of the FAC, Zich alleges that Defendants deprived him of equal protection of the law in violation of 42 U.S.C. § 1983 by subjecting him to (1) unfavorable terms and conditions of employment because he "utilized available sick time allocated to him in order to treat a disintegrating cornea in his left eye and other major eye problems" (FAC ¶ 34); and (2) "an arbitrary and unfounded course of discriminatory and harassing conduct." (*Id.* ¶ 35.) Defendants deny that Zich was denied equal protection of the law and argue that they are entitled to qualified immunity from liability in any event.

### 1. Equal Protection

The Supreme Court has held that an equal protection claim may be brought by a person who is a member of a "class of one." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam). *See also Discovery House, Inc. v. Consolidated City of Indianapolis*, 319 F.3d 277, 282 (7th Cir. 2003); *Hilton v. City of Wheeling*, 209 F.3d 1005, 1007 (7th Cir. 2000). To succeed under this theory, Zich must show that (1) he was "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment" or (2) "the government is treating unequally those individuals who are prima facie identical in all relevant respects, and that the cause of the differential treatment is a 'totally illegitimate animus toward the plaintiff by the defendant.'" *Nevel v. Village of Schaumburg*, 297 F.3d 673, 681 (7th Cir. 2002) (quoting *Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001)). *See also Northwestern University v. City of Evanston*, No. 00 C 7309, 2002 WL 31027981 (N.D. Ill. Sept. 11, 2002) (discussing Seventh Circuit's treatment of traditional and vindictive action equal protection claims).

Zich argues that Defendants treated Allen Folkes more favorably by removing Zich as lead man and assigning his duties to Folkes. (Pl. Resp., at 4, 5.) Defendants insist that the lead position was eliminated and that no one has served in that role since October 2001. (Def. 56.1

26

¶ 6.)  Indeed, the maintenance workers all testified to their belief that the lead position was eliminated, and no one has been assigned Zich's pager, parking space, or telephone line.  At the same time, Zich points to evidence suggesting that Folkes has in fact assumed the lead duties. Quinn still has to designate someone as the "answer to" person to represent the Maintenance Department and respond to radio calls and emergencies when he is not available.  Quinn admittedly considers Folkes his "priority one" man for prioritizing and assigning jobs in his absence, a task previously performed by Zich.  Defendants claim that Robert DeMaio, Mark Klopp, and the department secretary have all helped assign jobs as well, but they offer no evidence as to how often that occurred, and none of the three was considered a "priority one" designee.  Nor does the fact that other co-workers were given this responsibility on occasion defeat Zich's claim that he was singled out for unequal treatment.

In addition, Quinn sent Folkes to all five training classes on the new Siemens computer system, and Folkes carries a pager that is programmed to the computer system so he can help respond to alarm calls, including assisting and training other maintenance workers in using the computer to rectify problems in the building.  Taken together, Zich has raised a genuine issue of fact as to whether Folkes took over his duties as lead man, which calls into question the rationality of Defendants' claim that they eliminated the lead position "to allow better maintenance coverage in the building for the expanded activities" at the school during evening hours.  (Def. Reply, at 7; Def. Mem., at 13.)[18]  Indeed, it is undisputed that when Zich was lead man, he always helped with his share of the maintenance work.  (Pl. 56.1 ¶ 249.)

There is also evidence from which a jury could reasonably conclude that Quinn acted vindictively in removing Zich from the lead position.  (Pl. Resp., at 4, 6-7.)  Quinn considered Zich's attendance to be "abysmal" and suggested that Zich's pattern of missing work at the beginning and

_____

[18]     Defendants' Reply Memorandum in Support of Rule 56 Motion for Summary Judgment is cited as "Def. Reply, at __."

end of the work week, together with his varying excuses, "would bring some questions into your mind about possible problems." (Quinn Dep., at 63-64.) Quinn noted that Zich used sick days when his children were home sick or his dog was ill, but admitted that he never objected to Zich's use of sick days in that manner. The week before the September 14, 2001 meeting, Quinn told maintenance worker Egrain Collazo that he was angry because Zich, DeMaio, and Folkes had all been out sick on the same day the previous week. Quinn testified that he blamed Zich for the "remarkable drop in attendance" among the other maintenance workers, and that Zich was setting "a terrible example, as the lead man, for the rest of the crew, and . . . if you're going to be the leader, you have to lead in all categories." (Quinn Dep., at 70-71.) Quinn warned Zich about his attendance in Zich's April 2000 and April 2001 performance reviews, but Zich claims that most of the absences were due to the four or five eye surgeries he had between September 2000 and March 2002, which required him to take approximately 100 sick days.

In the absence of any attendance records substantiating the number of days Zich missed and the reasons he was off work, Zich has at least raised a question of fact as to whether Quinn took away his lead position not for the reasons he expressed, but because he was upset that Zich used so many sick days to care for his eye.[19] Quinn admittedly never assigned Zich to be the "answer to" person, and a jury could find Quinn's explanation – that it would somehow be unethical or improper to do so – unworthy of belief. Indeed, Defendants insist that the lead position was eliminated because of revised staffing needs, not because of any wrongdoing by Zich. For similar reasons, a jury could find that Quinn deliberately lied about eliminating the lead position given the evidence that he gave the lead duties to Folkes.

---

[19]     If Quinn's concerns about Zich's attendance were the true reason for his decision, the court is uncertain why Defendants have not been more forthcoming. No federal statute of which this court is aware precludes an employer from taking action based on an employee's poor attendance. See E.E.O.C. v. Yellow Freight Sys., Inc., 253 F.3d 943, 949 (7th Cir. 2001) (en banc) (ADA does not require employers to accommodate "unreliable attendance").

The court notes that there is some evidence that Quinn removed Zich as lead person in part because he had lost confidence in Zich's supervisory skills. Testimony from some of the maintenance workers supports this claim. (Folkes Dep., at 34-35; DeMaio Dep., at 36; Collazo Dep., at 14, 27.) If Defendants "would have taken the complained-of action anyway, even if [they] didn't have the animus, the animus would not condemn the action." See Albiero, 246 F.3d at 932. Defendants, however, have not presented any argument in this regard and, as noted, maintain that the lead position was eliminated because of revised staffing needs in the department. Thus, Zich's lack of supervisory skills does not provide a basis for granting summary judgment on this claim.

### 2. Qualified Immunity

This brings us to Defendants' final argument – that the individual Defendants are entitled to qualified immunity for their actions. A government official is protected from individual liability under § 1983 "for actions taken while performing discretionary functions, unless [his] conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known." Brokaw v. Mercer County, 235 F.3d 1000, 1022 (7th Cir. 2000). Section 1983 "creates a cause of action based on personal liability and predicated upon fault; thus, liability does not attach unless the individual defendant caused or participated in a direct constitutional violation." Hildebrandt v. Illinois Dep't of Natural Resources, 347 F.3d 1014, 1039 (7th Cir. 2003) (quoting Vance v. Peters, 97 F.3d 987, 991 (7th Cir. 1996)). For supervisors,

> [a]n official satisfies the personal responsibility requirement of section 1983 . . . if the conduct causing the constitutional deprivation occurs at [his] direction or with [his] knowledge and consent. That is, he must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye. In short, some causal connection or affirmative link between the action complained about and the official sued is necessary for § 1983 recovery.

Id. (quoting Gentry v. Duckworth, 65 F.3d 555, 561 (7th Cir. 1995)).

It is undisputed that Babington and Quinn were both directly involved in the decision to remove Zich from the lead position, and the court has already determined that Zich presented

evidence sufficient to withstand summary judgment on his claim that the decision violated his Fourteenth Amendment right to equal protection. Zich has not shown, however, that the right was clearly established at the time of the alleged violation. The Supreme Court first recognized that a "class of one" can bring an equal protection claim in *Olech*, decided on February 23, 2000. 528 U.S. at 564 (differential treatment by village in zoning case). *See also Esmail v. McCrane*, 53 F.3d 176, 179-80 (7th Cir. 1995) (vindictive denial of license applications by city mayor). Courts have only recently begun to extend such "class of one" equal protection claims to the employment context, and most have involved plaintiffs who were members of a protected class. *See, e.g., McLaughlin v. Chicago Transit Authority*, 263 F. Supp. 2d 1130, 1138 (N.D. III. 2003) (claiming defendants "violated the Equal Protection Clause by discriminating against [plaintiff] due to her race, gender, and as a 'class of one'"); *Kiser v. Naperville Community Unit*, 227 F. Supp. 2d 954, 972 (N.D. III. 2002) (denying motion to dismiss class of one equal protection claim by employee alleging unlawful termination in violation of the ADEA); *Kozlowski v. Fry*, 238 F. Supp. 2d 996, 1023-24 (N.D. III. 2002) (dismissing class of one equal protection claim by employee alleging sex discrimination where she failed to demonstrate that others were similarly mistreated). *But see Simonsen v. Board of Ed. of City of Chicago*, No. 01 C 3081, 2002 WL 230777, at *13 (N.D. III. Feb. 14, 2002) (dismissing class of one equal protection claim by employee not alleging membership in a protected class based on admission that he was not singled out for differential treatment).

Zich has not cited any class of one employment cases that pre-date the September 14, 2001 decision to remove him as lead man. The court found one, *Staples v. City of Milwaukee*, 142 F.3d 383 (7th Cir. 1998), but the claim there failed because the employee did not identify any similarly situated employees who were treated differently. *Id.* at 387-88. To be "clearly established," "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Brokaw*, 235 F.3d at 1022 (quoting *Anderson*

30

*v. Creighton*, 483 U.S. 635, 640 (1987)). Zich has not met his burden of showing that a reasonable school official would have known in September 2001 that it was unlawful to treat Zich differently under the circumstances presented here. *Sonnleitner v. York*, 304 F.3d 704, 716-17 (7th Cir. 2002) (plaintiff "bears the burden of establishing the existence of a clearly established constitutional right"). Thus, Babington and Quinn are both entitled to qualified immunity from liability. For similar reasons, Helander-Heiser and Dr. Riggle, who were not even directly involved in the decision to remove Zich from the lead position, are also qualifiedly immune from liability.

## CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment (Docket No. 19-1) is granted. Defendants' Motion to Strike Plaintiff's Responses to Certain Paragraphs of Defendants' Local Rule 56.1 Statement of Facts and to Have Certain Facts Deemed Admitted (Docket Nos. 37-1, 37-2) is granted in part and denied in part as set forth in this opinion.

ENTER:

Dated: March 17, 2004

REBECCA R. PALLMEYER
United States District Judge

31